*293 Opinion of the Court, by
Ch. J. Boyle.
THIS was an action of ejectment. Various demises are laid in the declaration, in the names of different persons; but the only one upon which any point arises in the cause, is in the name of Charles Buck. The land in controversy, lies in what is usually called Henderson’s grant; and the appellants being the tenants in possession, were admitted defendants, and jointly pleaded not guilty. Buck derives title under the heiratlaw pf Colonel John Lutterel, and the defendants under his devisees. His will was made the 20th of March 1775, a few days before which, (to wit, on the 17Lh of the same month and year,) Henderson and company, of whom Lutterel was one, obtained a deed from certain chiefs of the Cherokee Indians, purporting to grant for themselves and the nation, to Henderson and company, in consideration of ten thousand pounds sterling, all the tract of country bounded by the Ohio, Kentucky and Cumberland rivers, and the highest ridge of Powell’s mountain. At the October session of 1778, the Virginia legislature passed an act, granting to Henderson and company, the tract of land op the Ohio, at, the moulh of Green river, which has since been known by the name of Henderson’s grant, and of which the land in controversy is apart; and m the spring ot the year 1781, Colonel Lutterel departed this life, without having revoked or republished his will. On this state of facts, the main question in the cause arises, namely, whether the interest which Lutterel had in the lands *294 granted to Henderson and company, passed by his will to his .devisees or descended to his heir at law?
Tbe lands granted by the state of Virginia, in 1778, to R. Henderson & company, although part of the tract purchased from the Indians, did not pass by their wills, made before that act took effect, but descended to their heirs at law.
The circuit court decided that the interest which Lutterel had in the land, did not pass by his will, but dcscendéd to his heir at law.
This decision we have no doubt is correct. The Indian deed certainly conveyed.no interest to Henderson and company. All purchases by individuals from the Indians, were expressly forbidden by the royal proclamation of 1763, which remained in force until the revolution, by which the then American colonies became independent states; and no sooner had Virginia thrown off the royal government and assumed the republican form, than she adopted the same principle, and by an ordinance of the convention of 1776, provided that no purchase should be made of the Indians, but on behalf of the public, and by the authority of the general assembly; and in May 1779, the legislature of Virginia expressly declared all'sales and deeds, as well those which had been made, as those which should be thereafter made by any Indian or Indian nation, for the separate use of individuals, utterly void and of no-effect. The competency of the Virginia legislature to make such past sales and deeds void, if even they bad not been so in their origin, cannot admit of a serious question; for at that time the legislature was under no constitutional restraint, which could have the effect of limiting its power in that respect. But the truth is, that all such sales and deeds, were in their origin void, and the act of 1779 was only declaratory of what the law was. The Indian deed, therefore, being void, ah initio, could have no operation, and of course could pass no interest or title to Henderson and company. Nor could they independently of the deed, have acquired any in-, terest or title to the land anterior to the grant from the Commonwealth; for admitting what, however, is not proved in the cause, that they bad entered upon the land in consequence of their purchase from the Indians, they could not thereby have gained a seizin or possession adverse to that of the king, or of the common-, wealth; for it is well settled, that the king or the- commonwealth cannot be disseized, and that where an individual enters upon the lands of the crown or the commonwealth, they are mere intruders, and acquire no title or interest to their own use, not even that of an ac- *295 tag&seiziin, the lowest grade of title*. At the’time, there-f$pe, of making bis -will, Lutferel had neither a tór-tí'fj'us nor legal es-tatedn the lands in controversy, and of course he had np interest which could p'assby.his will. He, no doubt, however, thought he had such an interest; for he expressly devises in his will, his part of the la’nds purchased from the Cherokee Indians; andasthe grant by the legislature of Virginia was'for a part of the same lands, it is contended for the defendants, that his interest thereby acquired/would passbyhis will. Were this a question of intention, we should have no hesitation in giving our assent to the position contended for on the part of the defendants; but it is not a question of intention, but a question of power; and whether anyone has a power to pass by his will, lands which he has not at the time of making his will, but which he after-wards .acquires, must depend upon positive law nqerilj-, for It is evident in the nature of things, that whendveir a rnan ceases to exist here, all his rights and his powers e^ase with him, and of course he can have no authority after his dlalh, to direct to whom his lands shall go, except so; far as he is permitted to do so by the positive institutions of society. By the common .law,-it is well known, that no one could devise his lands’,' and that the power to make a disposition of them by will, was given by the-statute of the 32d and 34lh of Henry 8th, usually eaHeckthe statute of wills. This statute was in force in Virginia at the time Lutterel made his will, and remained so until after his death; and according to its settled construction, no one can pass by his will, lands to which he has no title in law or equity, at the time of making his will, bulto which he afterwards acquires title.
The only authority relied on in the argument, to disprove this position, is a passage read from Shepherd’s Touchstone 428, where it is said, “ if a man devise another man’s land, this devise is void; but if he, after the -devise, purchase this land, now is the devise good.” For this doctrine, a reference is given by the author to the Case of Brets vs. Rigden, 1 Plowden 344. But, on adverting- to that case,- we find that the doctrine is only advance by- the counsel in the-argument, and is not sanctioned by the.judgmentof the ctiurt; ,for the court there determiné^ tjheit áfter-acq-úired lands did not pass by the devise in question, and expressly decide that such a de *296 vise is jiot within the words of the statute of wills. - BA-sides, the doctrine advanced by the counsel in the case oí Brets vs. Rigden, is said by the judges, in manysubsequCnt cases, not to be warranted by the Year' Book, 59th Henry VI. which is cited for its support; and is, expressly denied to be law, as will be seen by reference to the cases cited in the marginal note subjoined to' the case of Brets vs. Rigden, in the last edition of Plowden. The doctrine,, therefore, read by the counsel in the argument of the case from Shepherd’s Touchstone, is not law, and is clearly opposed to the whole current of adjudged cases upon fhe subject. The circuit court, therefore, decided correctly, that the land in question did not pass by Lutterel’s will ter his devishes, but descended to his heir at law.
Note. — The case of Johnson and Graham’s lessee vs. M’lntosh, decided in the supreme court of the United States, in 1826, decides the same principle, as to purchases from the Indians. 8 Wheat. 543.
There are some other points, which were made in the circuit court, and are assigned for error here; but they are such as have been heretofore decided by this court, or such as are so obviously untenable, as not to be relied on in argument, and having been correctly decided by the circuit court, they do pot seem worthy oBparlicular notice.
Judgment affirmed with costs.