DOLAN et ux., Plaintiffs and Respondents

v.

HUDSON et ux., Defendants, Cross-Complainants and Appellants

v.

DOLAN and PFEIFER-DRAKE & DODGE COMPANY, Defendants under Cross-Complaint, and Respondents

(156 N.W.2d 78)

(File No. 10416. Opinion filed January 30, 1968)
Rehearing granted April 11, 1968
(Opinion adhered to after rehearing. See Page 331 this volume.)

**Jones & Matthews, E. G. Jones,** Sioux Falls, for defendants and appellants.

**May, Boe & Johnson,** Sioux Falls, for plaintiffs and respondents.

HANSON, Presiding Judge.

Plaintiffs, Raymond B. Dolan and wife, as owners and sellers brought this action for specific performance of a contract to sell residential property against Douglas M. Hudson and wife, defendants and buyers. Defendants answered alleging principally that the purchase agreement was not specifically enforceable because: Their assent was given under a mistake of fact; their assent was obtained by unfair practice; the purchase agreement is ambiguous; plaintiffs have not performed their undertakings under the purchase agreement; and title insurance tendered was not performance. By cross complaint defendants also sought recovery of $1,000 paid down under the purchase agreement from the plaintiffs and their realtor, Pfeifer-Drake & Dodge Company.

Trial to the court resulted in entry of an interlocutory judgment in favor of plaintiffs decreeing specific performance of the contract with a direction to sell the property at execution sale if defendants failed or refused to pay the purchase price within the time prescribed. Defendants failed to pay and demanded sale of the property. It was sold to a third party. The sale was confirmed and a deficiency judgment entered in favor of plaintiffs in the amount of $18,059.93. Defendants appeal from both the interlocutory and deficiency judgments alleging fifty-two assignments of error.

The equitable remedy of specific performance is always addressed to the sound discretion of the court to be granted or denied according to the facts and circumstances in each instance. Vermeulen v. Meyer, 238 Iowa 1033, 29 N.W.2d 232. The ultimate issue in this case, therefore, is whether or not the trial court abused its discretion in granting specific performance of the contract of sale. Renner v. Crisman, 80 S.D. 532, 127 N.W.2d 717. In reviewing the evidence for this purpose we "must accept that version of the evidence, including the inferences which can be fairly drawn therefrom, which is favorable to the trial court's action. This is so because it is for the trial court to select the testimony and draw the inferences which he

relies on. Because his participation in the trial reveals to him many things that are helpful and sometimes essential in deciding fact issues, it is presumed that his findings are correct. Consequently, we are not free to disturb them unless satisfied that they are contrary to a clear preponderance of the evidence." Beatty v. Depue, 78 S.D. 395, 103 N.W.2d 187, 1 A.L.R.3d 531. The findings in this case are further fortified by a view of the premises and area involved by the trial court. Although not evidence, a view does afford the trier of facts a means of more satisfactorily understanding and evaluating the record evidence and we must assume this view "was of some value in assisting the judge to determine the issues of fact." Weidmeier v. Edelman, 75 S.D. 29, 58 N.W.2d 306.

In summary, it appears that plaintiff, Raymond B. Dolan, came to Sioux Falls, South Dakota in 1963 as Agency Manager for the Equitable Life Assurance Society. Upon arrival he purchased a suburban home in Cactus Heights, a development located a few miles northeast of Sioux Falls in a hilly wooded area. This development is located in Sioux Falls Township on the North Half of the Southwest Quarter of Section 12, Minnehaha County and includes a golf course and a club house occupied by the Sioux Falls American Legion Post. The plat of the area contains lots and streets designated as Fairway Place, Fairway Drive, and Cactus Drive. For the purpose of keeping the area desirable and uniform the owners filed a Declaration of Restrictions in the nature of covenants running with the land containing limitations and restrictions on the use of the lots and tracts within the development such as a restriction against using, improving, or occupying lots except for private one-family residence purposes.

The Dolan property faces east and abuts on Fairway Place. It consists of Lot 4 and the Northeasterly 36 Feet of Lot 5 in Block 1 of Cactus Heights with easements relating to a well and easements of ingress and egress over and upon Fairway Place, Fairway Drive, Cactus Drive, and the South 66 Feet of the N 1/2 of the S.W. 1/4 of Section 2, Township 101, Range 49. The latter easement describes an access road to Cactus Heights from

U. S. Highway 16. From the south end of Cactus Drive it extends west for about 1/2 mile and then south 1/4 mile on a township road. This road runs along side the golf course and conforms to the hilly terrain it traverses. It was referred to as the "legal", "scenic", or "roller coaster" road. Another access route called the McLiman road runs about 1/4 mile straight south to Highway 16. Both roads were constructed, graveled, maintained and are kept open in the winter by the Cactus Heights developer. The McLiman road, however, is not appurtenant to the Cactus Heights property and is located on land belonging to Mr. R. L. McLiman. It leads directly to the American Legion Club House and carries the bulk of that traffic. There are utility poles and wires located on one side of the road. It has been used as a road since 1958 by permission and under a rental agreement cancelable at the end of any year after 1963. Mr. McLiman claims the right to stop the use of this road by the public and residents of Cactus Heights at any time, but has no present intention of doing so. Although the McLiman road provides a shorter route to Highway 16 the other access road comes out on Highway 16 one half mile closer to Sioux Falls so the distance from Cactus Heights to the City of Sioux Falls is approximately the same over either route.

In October 1965 Dolan was notified of his transfer to the home office of his company so he listed his home for sale with the Sioux Falls Multiple Listing Service. This is an association of realtors whereby one listing constitutes a listing with all. The cross complainant defendant, Pfeifer, Drake & Dodge Company, is a member and W. J. Comstock is one of their agents. Comstock was a long time friend of defendants, Douglas Hudson and his wife, who owned and resided in a home at 2222 South Main in Sioux Falls. Mr. Hudson was General Agent for the Paul Revere Life Insurance Company in South Dakota. When the Dolan residence came on the market Comstock contacted the Hudsons and arranged for an inspection. He took them out on Tuesday, October 19, 1965. Both Mr. and Mrs. Dolan were at home and took the Hudsons on a tour of the house. This was the first time Comstock met the Dolans. The next day the Hudsons again inspected the house by themselves. The day follow-

ing they made another trip out with Mr. Comstock. In addition the Hudsons drove out to Cactus Heights several times that week by themselves.

The Dolans listed their home for sale for $52,500. On Saturday, October 23, 1965 there were some preliminary negotiations handled by Comstock whereby the Hudsons offered to trade in their home as part of the purchase price. The Dolans refused the trade offer, but reduced their asking price to $47,500. This offer was accepted by the Hudsons on the following day which was Sunday, October 24, 1965, by the preparation and execution of a Real Estate Purchase Agreement. The Agreement was prepared by Mr. Comstock at his home in the presence of Mr. and Mrs. Hudson. Comstock went over the terms of the contract with the Hudsons before they signed. Afterwards it was accepted and signed by the Dolans.

The Purchase Agreement provided the closing date of the sale and possession was to be given on January 15, 1966 or as agreed with the buyers' option of an earlier closing date. After agreeing to purchase the Dolan residence the Hudsons then offered their Sioux Falls home for sale. However, they were apparently unable to find a buyer prior to January 15, 1966.

The Hudsons did not elect to have the sale closed early so the Dolans waited until after the close of the year to have the abstract continued. On January 6, 1966 the abstract was delivered to the First National Bank of Sioux Falls where the Hudsons expected to make a loan. The bank had the abstract examined by attorney E. G. Jones. His opinion was rendered on January 11th, finding title of the premises to be in the Dolans, as joint tenants, subject to some exceptions and objections requiring correction. Significantly the opinion did not find the title to be unmerchantable in any particular.

After the attorney's opinion was rendered Mr. Hudson conferred with Tom Barron and Orville Bonacker, both Vice Presidents of the First National Bank. Barron testified he advised Hudson the bank was not in a position to make a loan on the property chiefly because of lack of direct access to Highway 16

over the McLiman road as pointed out in the attorney's opinion. However, Mr. Bonacker told Hudson the exceptions to the Dolan title would have to be corrected before a loan could be made. Time to make these corrections was requested of and refused by Hudsons' attorney.

On January 14 the Abstract together with an affidavit, Release of Lease, and Release of Easement were delivered to the Getty Abstract Company and a policy of title insurance was procured. Sometime prior the Dolans had moved out and vacated the premises. They had purchased a new home in Connecticut. On the day of closing the sale, plaintiffs tendered a warranty deed to the premises and the policy of title insurance. This was refused. At the same time defendants demanded return of their $1,000 down payment under the contract which was refused.

This action for specific performance followed on January 18, 1966. The trial court found in favor of plaintiffs and in a so-called Interlocutory Judgment entered on September 22, 1966 decreed specific performance of the Real Estate Purchase Contract and in the event defendants failed or refused to pay the purchase price within the allotted time for performance a special execution would issue to foreclose the vendor's lien at public auction after which plaintiffs would be entitled to judgment for any deficiency.

Defendants failed to pay the balance of the purchase price required in the Interlocutory Decree. Instead, they filed an application and obtained an order to show cause why the execution sale of the property should not proceed forthwith. Thereafter sale proceedings were held and the property was sold by the sheriff at public auction to one Derald Espeland. On January 20, 1967 the trial court entered its order confirming sale and judgment in favor of plaintiffs for a deficiency of $18,059.93.

■ ■ All of defendants' assignments of error relate back to rulings, findings, and proceedings affecting the Interlocutory Judgment. However, notice of entry of this judgment was not given and defendants waited until after the sale and entry of the deficiency judgment to appeal. This mode of procedure com-

plicates consideration and disposition of the issues on review as the status quo has not been preserved. The subject matter of the action has been sold to a third party whose right and title to the property cannot now be defeated or disturbed. Despite its name the Interlocutory Decree constituted a final and appealable judgment as it finally and completely adjudicated all of the issues of fact and law involved in this controversy. An appeal immediately after entry of the Interlocutory Judgment could have stayed the sale and preserved the status quo of the parties and the property. The test of finality is the substance of the decision rather than its form or name. 4 Am.Jur.2d, Appeal and Error, § 51, p. 573. See also Brown v. Memorial National Home Foundation, 158 Cal.App.2d 448, 322 P.2d 600, 72 A.L.R.2d 997.

■ There was no defeating ambiguity in the purchase agreement within the contemplation of SDC 1960 Supp. 37.4602(6) which would prevent specific performance. Its terms were sufficiently certain to make the precise acts of the parties to be done clearly ascertainable. It was prepared by defendants' friend Comstock. They examined and signed the contract before submission to plaintiffs for approval. The parties were knowledgeable experience businessmen. Both were successful insurance executives. Contracts were their stock in trade. The meaning of this one was clearly understood by both and clearly ascertainable by the court.

■ Likewise, there is no substantial credible evidence that defendants' assent to the purchase agreement was obtained by any misrepresentation, concealment or unfair practice on the part of plaintiffs or Mr. Comsotck. Although Comstock was legally plaintiff Dolan's agent, he was, in fact, Hudsons' long-time friend. It is extremely unlikely he misled, deceived, or unfairly dealt with his friends in this transaction. The Dolans gave the Hudsons every opportunity to fully inspect the house and premises. They answered every question put to them about the house and premises preliminary to the sale agreement.

■ In this same vein defendants contend their assent to the purchase agreement was given under a mistake of fact.

Their mistake involved the general access routes to Cactus Heights. They do not contend plaintiffs had no access to convey, but if they had known the McLiman road was not a property right they would never have signed the Purchase Agreement. In signing they relied upon an apparent right of access over the McLiman road because it afforded a more direct access to Cactus Heights, was more heavily traveled, was safer, and had the appearance of a public way. This misunderstanding was not the result of any misrepresentation. The subject of general access was apparently never discussed by the parties. Before the sale defendant Hudson asked plaintiff if there were any negatives about the property. In the course of his reply plaintiff indicated the biggest deficiency was the developer and "when this new road, the one that is referred to in unflattering terms by the defendant but one which I will call the legal road, when it was put in, it did not have landscaping along the side and the water had washed down it and had washed this muck onto the fairway number one fairway and this bothered a lot of people including myself and so as we stood there pointing to it, I said here is an example. There is a road that has been put in by the developer that runs from the western section line up through the parking lot and joins this area. I said I don't know the background but I believe it was put in by court order over some disagreement on property and I said that the road is there and had he taken the same money and gone to Mr. McLiman and agreed to buy his property he could have black-topped that entire road in and the whole thing for probably the same amount of money  *  *." From this testimony it would appear the legal access road was pointed out to defendants and they were alerted to the fact the developer did not own the Mc-Liman road.

■■ In Beatty v. Depue, 78 S.D. 395, 103 N.W.2d 187, this court recognized that a unilateral mistake of a material fact is ground for rescinding a contract under our statutes where consent to the contract is mistakenly given. However, the court further said the mistake had to be so fundamental in character that because of it the minds of the parties did not meet. The following test of materiality was quoted with approval from Grymes v. Sanders, 93 U.S. 55, 23 L.Ed. 798:

"A mistake as to a matter of fact, to warrant relief in equity, must be material, and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied, that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved."

Consequently, in order to rescind defendants had the burden of proving: (1) a mistake was made and (2) it was material. 36 Am.Jur., Mistake, page 456. This burden was not fulfilled in either particular. As the trial court observed in his memorandum opinion "I see no basis for defendants claim of mistake of fact. There was a full disclosure of all conditions surrounding the property by the Dolans and their agents and there was unlimited access given to the Hudsons to visit the property. I am satisfied that they were fully aware of all of the restrictions and conditions surrounding the property they were purchasing prior to the signing of the contract  *  *  *  From my personal examination of the property and the routes  *  *  *  the legal road, while a little rolly, is a good graveled highway and comes out onto highway sixteen at a corner where vision is greatly improved and where there is no danger of being hit by an automobile which you cannot see. Plaintiffs, by themselves or through their agents, have never contended or made any representations that [they] had any property right in the McLiman road. It provides another means of ingress and egress, even though permissive, to defendants. But in the event it is closed, defendants still have access over the legal road which is as short, direct and safe as the route by way of the McLiman road and highway sixteen. Further, in view of the improvements now served by the McLiman road, it would appear very doubtful if it is ever closed, but I find that fact immaterial here." Defendants may very well have assumed the McLiman road provided a legal means of access to Cactus Heights, but this would not justify rescission of the contract. This assumption, misunderstanding, or mistake was self-induced. It was not the result of any unfair practice or misrepresentation on plaintiffs' part. The gov-

erning rule is succinctly stated in 13 Am.Jur.2d, Cancellation of Instruments, § 32, p. 524, as follows: "Equity will relieve a party from a unilateral mistake that was a result of fraud or duress or was accompanied by other special facts creating an independent equity on behalf of the mistaken person, such as inequitable conduct of the other party, but cancellation should not be decreed against a party whose conduct did not contribute to or induce the mistake and who will obtain no unconscionable advantage therefrom."

According to SDC 37.4610 "An agreement for the sale of property cannot be specifically enforced in favor of a seller who cannot give to the buyer a title free from reasonable doubt." This refers to the condition of title at the time fixed for performance and requires one free from defects which actually impair title or which may reasonably be expected to expose the purchaser to adverse claims or litigation. See South Dakota Standards For Title Examination. This does not mean a title free from every technical defect that can be conjured up. Tripp v. Sieler, 38 S.D. 321, 161 N.W. 337. "Mere possibility or suspicion of defect is not sufficient, but, if there is a doubt or uncertainty sufficient to form the basis of litigation or color of an outstanding title which may prove substantial, the title cannot be said to be marketable." Larson v. Thomas, 51 S.D. 564, 215 N.W. 927, 57 A.L.R. 1246. A marketable title is one free from reasonable doubt and a purchaser is entitled to "have a title that will enable him to hold his land in peace, and, if he wishes to sell, be reasonably sure that no flaw or doubt will arise to disturb its market value." Godfrey v. Rosenthal, 17 S.D. 452, 97 N.W. 365. Plaintiffs complied with these requirements by tendering a policy of title insurance and a warranty deed to the premises on the day fixed for closing the sale.

Although the purchase agreement expressly allows the owner "to furnish an abstract of title or title insurance" defendants contend plaintiffs were bound by their election to furnish an abstract showing merchantable title and could not reexercise the option of furnishing title insurance in lieu of correcting defects in the abstract disclosed by their examination

of the abstract. This appears to be the rule in Texas, Cobb v. Nau, Tex.Civ.App., 12 S.W.2d 594, and Giddens v. Moore, Tex. Civ.App., 348 S.W.2d 404, especially where the seller refuses to cure or remove objections to the title. That is not the situation here. Plaintiffs were willing to correct objections to the title, but defendants refused to allow time to do so. To meet the closing time date plaintiffs were forced to procure title insurance. At the same time they procured affidavits and releases to meet the title objections. Plaintiffs' principal obligation under the contract was to convey merchantable title to defendants on January 15, 1966. Under the circumstances the means of doing so was immaterial and did not constitute a breach of the contract.

We have carefully examined the several other contentions and assertions made by defendants but find none would justify rescission or prevent specific performance of the contract. The two judgments appealed from are therefore affirmed.

BIEGELMEIER and HOMEYER, JJ., concur.

ROBERTS, J., concurs in result.

RENTTO, J., not participating.